IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PROPERTY RIGHTS LAW GROUP, P.C., an Illinois Professional Corporation, | ) ) ) | CIVIL NO. 13-00273 SOM/RLP |
| | ) | |
| Plaintiff, | ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' |
| | ) | MOTION FOR SUMMARY JUDGMENT |
| vs. | ) | |
| | ) | |
| SANDRA D. LYNCH, JOHN KANG, alias Lee Miller; and KEALA RODENHURST JAMES, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.      **INTRODUCTION.**

This case arises from a contract between Plaintiff Property Rights Law Group, P.C. ("PRLG"), and Defendant Sandra Lynch.  PRLG, a law firm, brought suit alleging that Lynch, a former employee of or independent contractor with PRLG, had violated the terms of that contract when she left the firm.  PRLG also brings related claims under the Illinois Trade Secrets Act (ITSA) and the federal Computer Fraud and Abuse Act (CFAA), as well as claims for defamation and tortious interference with prospective business relations.  Lynch allegedly downloaded PRLG's client lists and other "trade secrets," and solicited PRLG's clients to join her firm, the Lynch Law Offices.  PRLG claims that Lynch was aided in these activities by co-Defendants

Keala Rodenhurst James and "John Kang," who allegedly uses the alias "Lee Miller."

Defendants move for summary judgment in their favor on all claims asserted by PRLG. The court grants their motion in part and denies it in part.

## II.     BACKGROUND.

Robert Stone is the "Managing Partner" of PRLG, a law firm that specializes in defending borrowers facing foreclosure and in what PRLG calls "securitization/fraud sworn affidavits." PRLG Website Excerpt, ECF No. 72-2. Although licensed to practice in Chicago for several years, Stone has only been licensed to practice in Hawaii since July 07, 2013. Stone routinely relies on a self-described "Certified Forensic Securitization Auditor" named Teri Petit. Petit, who says she holds "a Series 7 securities broker license and Series 66 financial advisor's license," claims that "her education, licensure and experience" permit her to provide "evidence [for] use in court to defend foreclosure cases." Id.

In fact, it is not clear that Petit actually holds an active Series 7 or Series 66 license.[1] See Email Correspondence with Charles Benson, Securities Examiner at the Wisconsin

---

[1] At the hearing on the present motion, Stone maintained that Petit did in fact have these licenses. However, PRLG has not produced any evidence that Petit is currently licensed, even though such evidence would presumably be readily accessible.

Department of Financial Institutions, ECF No. 72-1 (stating that "Petit has not passed the Series 66 exam" and that her "series 7 license is not valid since she has been terminated from the industry for more than two years").  Nor does the record clarify what "certification" one could have as a "forensic securitization auditor."

The Federal Trade Commission describes so-called "forensic loan audits" as a technique used by "[f]raudulent foreclosure 'rescue' professionals [who] use half-truths and outright lies to sell services that promise relief to homeowners in distress."  See The Federal Trade Commission, Forensic Loan Audits, FTC Consumer information (Mar. 2010), https:// www.consumer.ftc.gov/articles/0130-forensic-loan-audits. Typically, "[i]n exchange for an upfront fee . . . so-called forensic loan auditors . . . backed by forensic attorneys offer to review [] mortgage loan documents to determine whether [the] lender complied with state and federal mortgage lending laws. The 'auditors' [tell clients they] can use the audit report to avoid foreclosure, accelerate the loan modification process, reduce [the] loan principal, or even cancel [the] loan."  Id.

Defendants submit declarations by ten homeowners in support of Defendants' contention that Stone and Petit are "fraudulent foreclosure 'rescue' professionals."  The declarations paint almost identical pictures of Stone and Petit's

conduct.  Stone and Petit apparently represented to prospective

clients that PRLG was a highly successful foreclosure defense

boutique that was "winning cases all across the country" and had

"never lost a case."  Declaration of Ronald Amasol ¶ 8, ECF No.

82-2; Declaration of R. A'oPohakuku Rodenhurst Exh. 1, ECF No.

82-8.  <u>See also</u> Declaration of Elizabeth Hagerty ¶ 3, ECF No. 82-

9.  The homeowners say they were told that they had a "great

case" and an excellent chance of prevailing if they hired PRLG.

Declaration of Michele Yalimaiwai ¶ 8, ECF No. 82-7; Declaration

of Aurelia and Victor Chong ¶ 8, ECF No. 82-4; Declaration of

Michael Koko ¶ 14, ECF No. 82-12; Declaration of Keneti Siaosi ¶

8, ECF No. 82-13.  For example, at least one potential client

says that Stone and Petit told him that his lawsuit would be a

"slam dunk" and "complete in just 90 days."  Declaration of David

Parker ¶ 5, ECF No. 82-10.  The homeowners all say that they were

told that if they retained  PRLG, they would get their homes

"free and clear" of any mortgage.  Declaration of Dianna Black ¶

8, ECF No. 82-3; Chong Decl. ¶ 6; Declaration of Kolani Kelly ¶

4, ECF No. 82-5.

At the hearing on the present motion, Stone

acknowledged that he told clients that his firm had "never lost a

case," despite the numerous judgments entered against PRLG's

clients.  Transcript of May 19, 2014, at 23-24, ECF No. 102.

Stone explained that he nonetheless considered himself not to

have "lost" a case because none of his current clients have yet been evicted from their homes.  Id.  However, at least one former PRLG client claims to have been evicted while being represented by the firm.  See Amasol Decl. ¶ 24.

The homeowners say that, to obtain representation by PRLG, they each paid $3000 for Petit's "forensic loan audit." Parker Decl. ¶ 3; Hagerty Decl. ¶ 6.  Petit allegedly represented to prospective clients that "she [was] the only person licensed to do this type of audit."  Parker Decl. ¶ 3.  One declarant says that Petit claimed to have "performed extremely successful audits all over the nation . . . which have been vital in [PRLG] never losing a case."  Rodenhurst Decl. Exh. 1, Email from Teri Petit. Petit also allegedly told clients that she had securities licenses and was an expert in foreclosure fraud, and that her "evidence" had "never been challenged in a court of law." Rodenhurst Decl. ¶ 3 and Exhibit 1 to Decl.

The $3000 "audit" that Petit provides clients is an affidavit signed by Petit, which purports to "explain" a client's mortgage documents to a court.  This "explanation" is simply an articulation of a discredited legal theory that whenever a trust comprising a securitized pool of mortgages is terminated, all the homeowners whose mortgages were pooled in that trust cease to have any loan obligations.  See Exh. 1 to Amasol Decl.; See also, Klohs v. Wells Fargo Bank, N.A., 901 F. Supp. 2d 1253 (D. Haw.

2012) (dismissing claim brought by PRLG).  This theory is the
basis for a form Complaint that PRLG has allegedly filed in
numerous cases.  <u>See</u> Memorandum in Support of Motion at 17-18.
Far from having "never lost" and rendering clients "free and
clear" of mortgage obligations, PRLG does not appear to have
prevailed in any court using this theory.  Each homeowner
submitting a declaration in connection with the present motion
says that he or she has paid up-front fees of close to $8,000
followed by monthly payments of $1,000 for Petit's "affidavit"
and Stone's legal counsel.  Stone disputes that retainer fees are
required by PRLG.  <u>See</u> Second Declaration of Robert Stone ¶ 4.

　　　Stone has reportedly told several clients that he would
only represent them if they stopped making mortgage payments,
because their loans were allegedly not owned by the people they
were paying, and the "court would only believe [the bank had
done] something wrong if the [clients] stopped paying."   Black
Decl. ¶ 6; Parker Decl. ¶ 9.  Stone and Petit also allegedly
encouraged clients not to take advantage of loan modification
opportunities, describing such modifications as a "scam" that was
unnecessary "because [Petit's] audit would win the case."
Hagerty Decl. ¶ 10; Koko Decl. ¶ 4; Siaosi Decl. ¶ 4; Amasol
Decl. ¶ 19.

　　　The homeowners' declarations state that, having taken
the homeowners' money and demanded continuing monthly payments,

Stone and Petit then failed to update the homeowners as to the status of their cases. Siaosi Decl. ¶ 8. Some clients state that, when they asked for an accounting of how their fees were being spent, Stone and Petit simply failed to reply. Chong Decl. ¶ 13. Amasol Decl. ¶ 26. Some clients said that Stone and Petit just in general stopped communicating with them. Rodenhurst Decl. ¶ 12. Siaosi Decl. ¶ 24. Cases were allegedly voluntarily dismissed by PRLG without the clients' consent. Koko Decl. ¶ 19-20. Siaosi Decl. ¶ 28. Defendants point to ten cases brought by PRLG in federal court in Hawaii and twenty-three cases brought in federal court in Illinois, all using variants of the same legal theory. See Memorandum in Support of Motion at 17-18.

The contractual relationship at the center of the present lawsuit is not a contract between PRLG and a homeowner. Rather, it is the contract between PRLG and Sandra Lynch, an attorney. Entered into on May 1, 2012, the contract provided that Lynch would work as an "independent contractor" for PRLG, "performing specifically delegated substantive legal work under the direct supervision of" Stone. Agreement ¶ 2, ECF No. 1-1. The record does not reflect whether, at the time Lynch signed the contract, she knew how PRLG was conducting its practice. Although Stone was not at that time licensed to practice law in Hawaii, the contract provided that Lynch and Stone would "jointly . . . give legal opinions or advice to clients in Hawaii, . . .

sign legal papers or pleadings on behalf of clients in Hawaii, and . . . appear in court or before other tribunals on behalf of clients in Hawaii." Id.

The contract required Lynch to provide "a final results report . . . at the conclusion of [the] Agreement" that was to be "in such form and setting forth such information and data as is reasonably requested by [PRLG]." Id. ¶ 4.

Lynch also agreed not to disclose or use any of PRLG's "business and product processes, methods, customer lists, accounts, legal forms, and procedures" after she left the company. Id. ¶ 6. Lynch agreed that, when the agreement terminated, she would "immediately deliver to the Company all such files, records, documents, specifications, information, and other items in her possession or under her control." Id. Moreover, under the contract, any work product produced by Lynch while working for PRLG was to remain PRLG's exclusive property. Id. For its part, PRLG agreed to pay Lynch a bi-weekly salary and to cover her expenses and liability insurance. Id. ¶¶ 2,3. The parties do not dispute that PRLG performed its obligations under the terms of the contract.

PRLG alleges that, on April 22, 2013, Lynch launched a "coup" against PRLG, soliciting at least sixteen of the firm's clients to join "'Lynch Law Offices,' [a] new firm the three Defendants were secretly setting up while Defendants Lynch and

James were on the payroll of [PRLG]." Complaint ¶ 14, ECF No. 1. PRLG alleges that, by this stage, Defendants "had induced two employees to resign from PRL Group and [were] working on inducing another." Id. PRLG introduces as evidence an email from Lynch to a co-worker stating that Lynch was leaving PRLG and that "several of the clients [were] coming with [her]." Email to John Rigney, ECF No 1-2. On April 24, 2013, PRLG sent Lynch a cease and desist letter. See ECF No. 1-3. According to PRLG's then-attorney, Kenneth Nakasone, Lynch called him in response to the letter and informed him that, while she "had returned seven files to the clients who remained clients of [PRLG's]," she intended to keep the "electronic files of the clients who were staying with her." Declaration of Kenneth Nakasone, ECF No. 1-4. At the hearing on the present motion, Lynch admitted that she did not return hard copies of certain client files, but argues that her retention of those files was required by law. See Transcript at 10. PRLG alleges that Lynch and her co-Defendants are attempting to solicit more clients for their business by making "intentional, material misrepresentations of fact to [PRLG's] clients." Complaint ¶ 14.

PRLG states that, in addition to client files, Defendants have failed to return other "records, reports, legal forms, documents, specifications, information, letters,

notes, media list[s], original artwork/creative, notebooks, and similar items relating to the business of PRL Group." Id. ¶ 23. Beyond this general list, PRLG does not specify or provide any detail regarding what these documents are.

Finally, PRLG claims that Defendants have defamed the firm through email and by "publishing on the Facebook page of John Kang (alias Lee Miller) [] accusations that [PRLG] is engaging in criminal activity, . . . [is] not licensed to do business in Hawaii, and that it is professionally incompetent." Complaint ¶ 29. While the alleged excerpt from Miller's Facebook page does state that PRLG's attorneys are not licensed in Hawaii, that they are professionally incompetent and that the firm has violated numerous "federal and state laws," it does not in fact say that PRLG committed any criminal violation. See Facebook Excerpt, ECF No. 1-10.

PRLG also attaches an excerpt from a website called the "Ripoff Report," which criticizes the firm. See Ripoff Report Excerpt, ECF No. 1-11. This document makes accusations similar to those in the Facebook post. It does not mention any criminal violation. PRLG alleges that the Ripoff Report post was authored by Defendants, but nothing on the face of the document nor any other evidence in the record indicates that this is so. The only indication of the post's authorship is a line at the top of the excerpt saying that it has been "Reported By: John Raney."

Lynch contends that she "did nothing to "steal clients" or solicit them to terminate their "relationship" with PRLG. Memorandum in Support of Motion at 15.  She provides evidence that PRLG's clients sought her out after they became disgruntled with Stone and Petit's operation.  Several former PRLG clients attest that Lynch neither solicited their business nor criticized PRLG when she left the firm.  Chong Decl. ¶ 17-18; Kelly Decl. ¶ 16; Siaosi Decl. ¶ 16; Yalimaiwai Decl. ¶ 21; Rodenhurst Decl. ¶ 13.  Clients who went on to hire Lynch claim they themselves sought her out after she left PRLG.  Hagerty Decl. ¶ 16; Amasol Decl. ¶ 25; Black Decl. ¶ 8.

**III.      JURISDICTION.**

PRLG contends that this court has jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, and the parties are citizens of different states.

Describing PRLG as actually a citizen of Hawaii, Defendants argue that there is no diversity of citizenship. "[A] corporation is typically a citizen of two states for determining the existence of diversity jurisdiction: the state of incorporation and the state in which it has its principal place of business." Breitman v. May Co. California, 37 F.3d 562, 564 (9th Cir. 1994).  It is undisputed that Plaintiff Property Rights Law Group, P.C., is incorporated in Illinois.  Defendants argue,

however, that the entity has its principal place of business in Hawaii.  A corporation's principal place of business is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010).  It is normally "the place where the corporation maintains its headquarters—-provided that the headquarters is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings."  Id. at 93.

To the extent Defendants are raising a factual challenge to jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the challenge lacks evidentiary support that PRLG's "nerve center" is in Hawaii.  Instead, Defendants appear to rely principally on PRLG's admission in its Complaint that "PRL Group has been authorized to do business in the State of Hawaii and has maintained a permanent branch office in the County and City of Honolulu."  Complaint ¶ 8.  This assertion does not, without more, render PRLG a citizen of Hawaii.  A branch office in a particular state does not automatically make a company a "citizen" of that state for the purposes of the federal diversity statute.  See Wachovia Bank v. Schmidt, 546 U.S. 303, 317 (2006).

Defendants also allege that most of the cases that PRLG handles are in Hawaii.  Even if Defendants could demonstrate that

this is so, it would not show that the Hawaii office is the firm's "actual center of direction, control, and coordination." Hertz Corp., 559 U.S. at 93.  On the present record, PRLG meets its burden of showing that this court has diversity jurisdiction over its lawsuit, and Defendants do not meet their burden as movants challenging jurisdiction.  Defendants may, of course, bring a Rule 12(b)(1) factual challenge at any stage in the litigation.  See Oregon v. Legal Servs. Corp., 552 F.3d 965, 969 (9th Cir. 2009) ("An objection that a federal court lacks subject matter jurisdiction may be raised at any time.").  However, given the absence of evidence undermining PRLG's contention that its nerve center is in Illinois, Defendants have not as of now shown that this court lacks subject matter jurisdiction.

          In any event, PRLG also brings a claim under a federal statute, meaning that PRLG may invoke federal question jurisdiction.  Either diversity or federal question jurisdiction allows this court to exercise supplemental jurisdiction over PRLG's pendent state law claims.  See 28 U.S.C. § 1367; see also Bell v. Hood, 327 U.S. 678, 682-83 (1946) (noting that a federal claim may not be dismissed for lack of subject matter jurisdiction unless it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.");  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir.

2004)("[J]urisdictional dismissals in cases premised on federal-question jurisdiction are exceptional.") (internal quotation marks omitted).

IV.      SUMMARY JUDGMENT STANDARD.

        Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

        Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  The burden initially falls on

the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial. T.W. Elec. Serv., 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); see also Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at

587).  Accord Addisu, 198 F.3d at 1134 ("There must be enough
doubt for a 'reasonable trier of fact' to find for plaintiffs in
order to defeat the summary judgment motion.").

In adjudicating summary judgment motions, the court
must view all evidence and inferences in the light most favorable
to the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 631.
Inferences may be drawn from underlying facts not in dispute, as
well as from disputed facts that the judge is required to resolve
in favor of the nonmoving party.  Id.  When "direct evidence"
produced by the moving party conflicts with "direct evidence"
produced by the party opposing summary judgment, "the judge must
assume the truth of the evidence set forth by the nonmoving party
with respect to that fact."  Id.

**V.          ANALYSIS.**

**A.    Breach of Contract (Count I).**

This court begins its analysis of Defendants' motion
with respect to Count I, the breach of contract claim, with the
threshold issue of what law applies to that claim.  "A federal
court sitting in diversity must apply the forum state's choice of
law rules."  Jorgensen v. Cassiday, 320 F.3d 906, 913 (9th Cir.
2003).  See also MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co., 197
F.3d 1276, 1282 (9th Cir. 1999) ("In a federal question action
where the federal court is exercising supplemental jurisdiction
over state claims, the federal court applies the choice-of-law

rules of the forum state."). Under Hawaii law, "[w]hen the parties choose the law of a particular state to govern their contractual relationship and the chosen law has some nexus with the parties or the contract, that law will generally be applied." Airgo, Inc. v. Horizon Cargo Transp., Inc., 66 Haw. 590, 595, 670 P.2d 1277, 1281 (1983).

The contract between Lynch and PRLG includes a choice of law provision specifying that Illinois law applies. While the record does not reflect precisely where the contract was signed, PRLG has its nerve center in Illinois, Lynch was interviewed for her job in Illinois, and Stone and Petit appear to reside in Illinois. These facts create a sufficient nexus with Illinois for the application of Illinois law to PRLG's contract claim. See Picardy v. Sky River Mgmt., LLC, 129 Haw. 106, 294 P.3d 1092 (Ct. App. 2013) (applying Nevada law because it was specified in contract's choice of law provision and one party was "headquartered in Nevada; the majority of its employees [were] located in Nevada; [plaintiff] interviewed for the job in Nevada; and . . . [some defendants] reside[d] in Nevada.").

Under Illinois law, the elements of a breach of contract claim are "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." Gonzalzles v. Am. Exp. Credit Corp., 315 Ill. App.

3d 199, 206, 733 N.E.2d 345, 351 (2000).  "A defendant's failure to comply with a duty imposed by the contract gives rise to the breach."  Id.

This court has already dismissed PRLG's breach of contract claim against all Defendants other than Lynch.  The only remaining breach of contract claim therefore relates to Lynch's conduct.  Lynch first argues that summary judgment should be granted in her favor on the breach of contract claim because the evidence PRLG relies on is insufficient to establish that she breached her contract.  See Celotex Corp., 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.").

While PRLG's Complaint and briefing are less than clear in tying Lynch's alleged actions to particular contractual provisions, the court concludes that, based on the evidence in the record, there are at least questions of fact regarding three ways in which Lynch may have violated her contract with PRLG.

First, Lynch may have violated the contract's confidentiality provision by keeping certain "client files" after leaving the firm.  The contract states, "All files . . . relating to the business of the Company, whether prepared by the Contractor or otherwise coming into her possession, shall remain

the exclusive property of the Company" and "[t]he Contractor shall not retain any copies . . . without the Company's prior written permission." Agreement ¶ 6, ECF No. 1-1. Nakasone, PRLG's lawyer at the time, says that Lynch told him "that she had scanned and uploaded all client files electronically . . .[and] admitted that she [kept] some of the electronic files for clients that she was keeping, but deleted others." Nakasone Decl. ¶ 6. Nakasone further states that Lynch's declared reason for not returning the files was fear that returning them would constitute aiding and abetting an unlawful operation. Id. ¶ 7. Lynch does not dispute that she kept the files of clients who left PRLG to be represented by her firm. This retention of files is at least arguably a breach of her agreement to return "all files" to PRLG upon leaving the firm.

A second way in which Lynch may have violated the contract is by contacting PRLG's clients, either before or soon after her termination, to solicit business for her own firm. The contract prohibits Lynch from using "in any manner, either during the term of this Agreement or at any time thereafter, except as required in the course of [her] engagement with the Company," any of the firm's "various trade secrets, innovations, processes, information, records, and specifications." Agreement ¶ 6. It is undisputed that several of PRLG's former clients left the firm to join Lynch's firm. Lynch also sent a letter to a co-worker on

19

April 22, 2013, in which she said that at least sixteen of PRLG's clients were "coming with [her]."  There is a question of fact as to whether Lynch "used" "information" and "records" to obtain these clients.  For example, Lynch may have only discovered these individuals' addresses and their need for counsel through her work with PRLG.  Such "use" of confidential information may have violated the contract.

Finally, in addition to possibly having breached the contract's confidentiality provision, Lynch may have breached its "work product" provision.  The contract required Lynch to provide "a final results report" upon leaving the firm "in such form and setting forth such information and data as is reasonably requested by [PRLG]."  Agreement ¶ 4.  At the hearing on the present motion, Lynch admitted that she did not provide PRLG with such a report when she left the firm.  Transcript at 33.

Because a reasonable fact-finder could determine by a preponderance of the evidence that Lynch violated the contract in the above three ways, summary judgment is denied as to those particular grounds for the breach of contract claim.

The record does not, however, support any contractual breaches beyond these three specific possible violations.  The Complaint contains other general allegations regarding the disclosure or use of various firm documents.  These allegations largely recite the broad terms used in the contract without

identifying the particular documents allegedly "used" or
"disclosed."  What details are included in the record do not show
that anything other than, at most, client files may have been
misappropriated.  For example, PRLG alleges that Lynch downloaded
and kept "e-mails of the firm's clients . . . [and] the templates
for the pleadings in all PRL Group's cases."  But the only basis
PRLG appears to have for this accusation is an email sent by
Lynch to Keala Rodenhurst, who was then also working for PRLG,
discussing how to "upload" documents onto the firm's shared
drive.  <u>See</u> Rodenhurst Email, ECF No. 1-6.  This email appears to
be discussing putting documents onto the firm's shared drive,
rather than taking them off.  Even if it was discussing
"downloading" documents, the email is clearly dated January 24,
2013, almost three months before Lynch left the firm.  Lynch was
authorized at the time to use the firm's shared drive and,
presumably, to discuss the operation of that drive with
Rodenhurst.  Nothing in that email supports the conclusion that
Lynch retained firm documents, other than client files, after her
departure.

PRLG also accuses Lynch of downloading and retaining
"client lists" to aid in her solicitation of the firm's clients.
But the record does not support the reasonable inference that
Lynch downloaded any such lists.  Stone intimates that he has
personal knowledge of the downloading of such lists, <u>see</u> First

Declaration of Robert Stone ¶ 8, ECF No, but provides no indication of the source of such knowledge. He does not, for example, say he reviewed computer records showing who accessed and downloaded materials from the PRLG's shared drive. PRLG simply reproduces the firm's client list with the title "PRL Group's Clients Solicited By Defendant Lynch." ECF No. 1-5. That document does not show that Lynch did anything.

Stone also declares that Lynch disclosed confidential materials to her co-Defendants. See First Stone Decl. ¶ 9. Stone does not explain how he gained personal knowledge of such disclosures to third parties. See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . and show that the affiant or declarant is competent to testify on the matters stated."); see, e.g., Wicker v. Oregon ex rel. Bureau of Labor, 543 F.3d 1168, 1178 (9th Cir. 2008) ("The affiants' assertions about a meeting which they apparently did not attend and about which they had no personal knowledge are not the proper subject of an affidavit.").

Stone may be concluding from the email Lynch sent to Keala Rodenhurst regarding the "uploading" of documents that Lynch must have actually wrongfully disclosed confidential information about clients through uploaded documents. But at the time of the email, Lynch and Rodenhurst were both doing work for PRLG and had legitimate access to firm materials. There is

nothing inherently nefarious about a discussion between co-workers about uploading documents.  Nor does that mail suggest that Lynch was sharing materials with co-Defendant Lee Miller, who was apparently not working for PRLG.  Instead, the email indicates only that Miller helped show her a way of uploading files.  While this court draws reasonable inferences in PRLG's favor, no reasonable fact-finder could conclude based only on that email and Stone's declaration that Lynch engaged in the unauthorized sharing of any confidential materials.

In short, there are questions of fact regarding whether Lynch violated the contract in three ways: first, Lynch may have violated the nonretention provision by keeping client files; second, Lynch may have "used" confidential information to solicit clients; and third, Lynch may have violated the work product provision by failing to provide a "final results report" upon leaving the firm.  With respect to these three ways in which Lynch may have violated the contract, summary judgment is denied.  However, because PRLG is unable to provide any affirmative evidence in support of any other contractual breaches, summary judgment is granted in Lynch's favor on any breach of contract claim not premised on the three circumstances described above.  See F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) ("to avoid summary judgment, a non-movant must show a genuine issue of material fact by presenting affirmative evidence from which a

jury could find in his favor"); <u>see also</u> <u>UA Local 343 United</u>
<u>Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting</u>
<u>Indus. of U.S. & Canada, AFL-CIO v. Nor-Cal Plumbing, Inc.</u>, 48
F.3d 1465, 1471 (9th Cir. 1994) ("[A nonmovant's] burden of
contradicting appellees' evidence is not negligible . . . . [If]
the evidence is merely colorable or is not significantly
probative summary judgment may be granted.") (internal quotation
marks omitted).

      Lynch argues that, even if there is a question of fact
regarding whether she has breached the contract, summary judgment
should be granted in her favor based on her affirmative defense
that the contract with PRLG was "void, unenforceable, and against
public policy."  A defendant bears the burden of proof when
asserting an affirmative defense and "must establish beyond
peradventure all of the essential elements of the . . . defense
to warrant [summary] judgment in [their] favor." <u>Martin v. Alamo</u>
<u>Cmty. College Dist.</u>, 353 F.3d 409, 412 (5th Cir. 2003) (internal
quotation marks and emphasis omitted); <u>see also</u> <u>Clark v. Capital</u>
<u>Credit & Collection Servs.</u>, 460 F.3d 1162, 1177 (9th Cir. 2006)
(at summary judgment stage, defendant has burden of proof with
respect to affirmative defense).  Lynch does not carry this
burden.

      Lynch argues that her contract with PRLG is void
because Stone and Petit engaged in the "unauthorized practice of

law in Hawaii." Memorandum in Support of Motion at 12. Lynch says that Stone and Petit "practiced law" in Hawaii by "preparing complaints" for certain clients and "contacting, engaging, and accepting fees for services from Hawaii homeowners." Id. at 14. Lynch argues that this conduct violates section 605-14 of Hawaii Revised Statutes, which prohibits the "unauthorized practice of law," and section 605-2 of Hawaii Revised Statutes, which states that "no person shall be allowed to practice in any court of the State unless that person has been duly licensed so to do by the supreme court."

Lynch fails to meet her summary judgment burden as to this affirmative defense. As an initial matter, Lynch does not show that Stone's out-of-court representation of Hawaii clients before he passed the Hawaii bar examination necessarily violated any law. Stone is not alleged to have appeared in any judicial proceeding in Hawaii or to have signed any document filed in a court in Hawaii before passing the Hawaii bar examination. It is commonplace for attorneys to work on cases outside of the jurisdictions they practice in, and to solicit local counsel or seek admission pro hac vice only as needed (e.g., when representing clients in a court in another jurisdiction). Lynch points to no authority suggesting that this common occurrence constitutes the unauthorized practice of law.

There are, in addition, disputed issues of fact regarding exactly what, if anything, Stone was doing with respect to Hawaii clients at the time Lynch left the firm.  An attorney has not "rendered any legal services 'within the jurisdiction,'" and therefore has not violated section 605-14, if "Hawai'i counsel [are] at all times 'in charge' of clients' representation."  Fought & Co. v. Steel Eng'g & Erection, Inc., 87 Haw. 37, 48, 951 P.2d 487, 498 (1998).  Stone claims that Hawaii counsel was "in charge" of representation in all the cases he worked on in Hawaii before he contracted with Lynch, see Second Stone Decl. ¶ 3, and that Lynch herself, who is licensed in Hawaii, managed the cases she worked on for PRLG.  The record does not make clear precisely what involvement Stone had in any of these cases.  Defendants simply do not establish that they are entitled to summary judgment on this affirmative defense.

Finally, even if Stone unlawfully represented clients in Hawaii, that would not necessarily demonstrate that Lynch was either compelled by law to violate the terms of her contract or free to ignore those terms.  Only if continued performance under the contract would itself have violated Hawaii law would Lynch be excused from compliance with its provisions.  See, e.g., Douthart v. Congdon, 197 Ill. 349, 354, 64 N.E. 348, 349 (1902).  Even assuming Stone unlawfully represented Hawaii clients in the past, or was intending to do so in the future, Lynch herself would not

necessarily have facilitated the violation of any law by returning client files, producing a final results report, or refraining from soliciting clients. Given the lack of evidence as to the contents of the client files in issue and as to the nature of Lynch's interactions with PRLG's clients as she left the firm, this court cannot determine whether Lynch could have lawfully performed under the contract, irrespective of whatever wrongdoing Stone may have engaged in.

Lynch also asserts the defense of unclean hands, arguing that because PRLG was perpetrating a fraud against its clients, it should be barred from recovering on the basis of its contract with Lynch. Under Illinois law, "[t]he doctrine of unclean hands applies if a party seeking equitable relief is guilty of misconduct, fraud, or bad faith *toward the party against whom relief is sought* and if that misconduct is connected with *the transaction at issue* in the litigation." <u>Zahl v. Krupa</u>, 365 Ill. App. 3d 653, 658, 850 N.E.2d 304, 309 (Ill. App. Ct. 2006) (emphasis added). Notwithstanding any evidence suggesting that PRLG may have engaged in "misconduct, fraud, or bad faith" against its clients, the court cannot discern any evidence that PRLG perpetrated a fraud against Lynch in either the formation or the performance of the contract. Absent evidence that Lynch herself was defrauded, her unclean hands defense is unavailing.

The court is not denying that there is significant evidence in the record indicating that PRLG falsely represented itself to clients. In addition to the ten homeowners' declarations, Stone himself acknowledged at the hearing on the present motion that his firm tells clients the firm has "never lost a case." Transcript at 23-24. Stone suggested that this statement is true because his services allow clients to remain in their homes for long periods without making mortgage payments, even if judgments are ultimately entered against them in the cases filed by PRLG. Id. However, PRLG's statements to clients do not appear to be limited to telling clients that they will be able to remain in their homes during litigation. PRLG allegedly tells clients that PRLG has special strategies that *win* cases and allow clients to own their home free and clear of any mortgage obligation. It is highly doubtful that an ordinary consumer would interpret an assertion that PRLG has never lost a case as meaning that PRLG enables the consumer to delay foreclosure, which will ultimately occur and possibly be accompanied by a deficiency judgment if the foreclosure sale does not yield proceeds sufficient to satisfy the mortgage and related expenses.

To the extent PRLG was committing fraud through alleged misrepresentations, Lynch may have been understandably reluctant to continue to do PRLG's bidding and to possibly expose herself to personal liability for the firm's actions. While, as

explained above, Lynch herself may not have been the victim of any fraud that could support her affirmative defense, she possibly could argue that returning files and writing a final results report would have aided and abetted PRLG in violating, for example, section 480-2 of Hawaii Revised Statutes, which prohibits unfair and deceptive trade practices.  And a section 480-2 violation could also void PRLG's agreements with its clients, thereby possibly opening the door for Lynch to be allowed to solicit their business.  See Haw. Rev. Stat. § 480-12 ("Any contract or agreement in violation of this chapter is void and is not enforceable at law or in equity.").  However, that is not an argument that Lynch raises in her motion.  She points to no consumer protection or other law that she would have violated by continuing to perform work for PRLG.

        At most, Lynch refers to a "violation of consumer protection statutes" in her Answer to the Complaint, but she gives PRLG no notice that any such statute is the basis of her summary judgment motion.  Therefore, while that argument has not been waived, the court does not consider it to be before the court on the present motion.  See, e.g., W. Reserve Oil & Gas Co. v. New, 765 F.2d 1428, 1432 n.1 (9th Cir. 1985) (noting that issues not raised by the parties are not before the court).  To the extent Lynch relies on her affirmative defenses in seeking summary judgment on Count I, her motion is denied.

## B.    Illinois Trade Secrets Act (Count II).

The court turns next to Count II, which alleges a violation of the Illinois Trade Secrets Act.  As with Count I, the court begins its analysis by examining which law applies.

While, under Hawaii's choice of law rules, Illinois law applies to PRLG's contract claim, it does not follow that Illinois law necessarily governs this entire case.  The contract specifies only that Illinois law "shall govern the validity of th[e] Agreement, the construction of its terms and the interpretation of the rights and duties of the parties hereto." Agreement ¶ 12.  It does not state that Illinois law governs all claims brought by a party.  Hawaii's choice of law rules require only "some nexus" between the parties and a chosen law when the parties have specifically agreed to the application of that law. Airgo, 670 P.2d at 1281.  But considerably more is required for noncontractual claims.

When the parties have not agreed to the application of a particular state's law, Hawaii's choice of law rules require a "flexible approach [that] places primary emphasis on deciding which state would have the strongest interest in seeing its laws applied to the particular case."  Del Monte Fresh Produce (Hawaii), Inc. v. Fireman's Fund Ins. Co., 117 Haw. 357, 364, 183 P.3d 734, 741 (2007) (internal quotation marks omitted).  Courts must therefore weigh "the interests of the states and applicable

public policy reasons [to] determine whether Hawaii law or another state's law should apply." Id. If all the conduct relevant to a noncontractual claim occurred in Hawaii, then it may be that it is Hawaii law that applies to that claim, in which event a claim based on Illinois law would not be cognizable. Having said that, the court declines to make such a determination on the present record. As the moving parties, Defendants must carry their burden of persuasion. At the very least, that means they must articulate and support their arguments. Defendants do not carry that burden with respect to Count II.

At most, Defendants vaguely suggest that Illinois law is inapplicable when they say, "The Northern District of Illinois (if the Court finds that it must apply Illinois law, which Defendants dispute) held in *National Presto Industries, Inc. v. Hamilton Beach*, No. 88 C 10567, 1990 WL 208594 (N.D. Ill. Dec. 10, 1990), it could not prohibit the copying of a product once it enters the public domain." Memorandum in Support of Motion at 17. Defendants say absolutely nothing about why they dispute the application of Illinois law. They therefore do not obligate PRLG to respond by showing that Illinois law does indeed apply. Throwaway parentheticals are not an appropriate way of raising issues. This court concludes that the choice of law issue has not been properly raised on the present record. This does not mean that the issue can never be resolved before judgment. It is

just not an issue that this court will analyze on its own in deciding this motion.

Absent a threshold determination as to whether Illinois law applies, this court does not reach the merits of Count II. No claim is asserted under Hawaii's Trade Secrets Act, so this court does not examine that alternative basis for a claim.[2] Summary judgment is denied as to Count II.

### C. Computer Fraud and Abuse Act (Count III).

Count III asserts a claim under the CFAA, which creates a private right of action for "[a]ny person who suffers damage or loss" when an individual "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage." See 18 U.S.C. §§ 1030(g), 1030(a)(5)(B). This court has previously ruled that it would

---

[2] Hawaii's Trade Secrets Act bars the "Disclosure or use of a trade secret of another without express or implied consent" and defines trade secret as "information, including a formula, pattern, compilation, program device, method, technique, or process that (1) Derives independent economic value, actual or potential, from not being generally known . . . and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Haw. Rev. Stat. § 482B-2. The Hawaii Trade Secrets Act, modeled after the Uniform Trade Secrets Act, is not identical to Illinois' trade secrets statute. See U.S. Gypsum Co. v. LaFarge N. Am., Inc., 508 F. Supp. 2d 601, 623 (N.D. Ill. 2007) ("Although patterned after UTSA, there is substantial variance between ITSA and the uniform version."). In particular, unlike the Illinois statute, Hawaii's Act does not explicitly include "customer lists" as a covered trade secret.

allow a claim based on accessing a "cloud" platform to proceed as asserting a CFAA violation based on accessing a "protected computer."  Order Granting in Part and Denying in Part Motion to Dismiss, ECF No. 71 at 9.  Defendants now contend that accessing the "cloud" is not accessing a "protected computer" under the statute.

One way in which a computer may receive CFAA protection is by being "used in interstate or foreign commerce."  It is undisputed that PRLG's cloud platform was connected to the internet.  An internet connection is sufficient for a computer to be "used in interstate or foreign commerce."  See United States v. Trotter, 478 F.3d 918, 921 (8th Cir. 2007) (noting that computer in question was "protected" because, by being connected to the internet, it met CFAA's requirement that it be used in interstate or foreign commerce).  Cf. United States v. Sutcliffe, 505 F.3d 944, 953 (9th Cir. 2007) (in case not involving CFAA, agreeing with Eighth Circuit that "[a]s both the means to engage in commerce and the method by which transactions occur, 'the Internet is an instrumentality and channel of interstate commerce.'") (quoting Trotter, 478 F.3d at 921).  Accessing PRLG's "cloud" constitutes accessing a "protected computer" within the meaning of the CFAA.

Nevertheless, PRLG's CFAA claim cannot survive the present summary judgment motion.  As discussed above, there is no

evidence before the court that Lynch accessed PRLG's cloud without authorization.  Presumably, Lynch was authorized to access the firm's cloud shared drive while she was still working for PRLG.  Other than Stone's allegation, which again lacks any indicia of personal knowledge, nothing in the record suggests that Lynch accessed the cloud after she left the firm.  Even if Lynch intended to harm PRLG while using the shared drive to download materials while she worked for PRLG, that alone would not establish that she acted "without authorization."  See LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1133 (9th Cir. 2009) ("No language in the CFAA supports [the] argument that authorization to use a computer ceases when an employee resolves to use the computer contrary to the employer's interest.").

Summary judgment is granted in Defendants' favor on PRLG's CFAA claim.

### D.   Defamation (Count IV).

In Count IV, PRLG alleges that Defendants have defamed PRLG.  While the Hawaii Supreme Court has not articulated a particular choice of law rule with regard to defamation claims, in weighing "the interests of the states and applicable public policy reasons," Del Monte Fresh Produce, 183 P.3d at 741, this court determines that Hawaii law should apply.  The allegedly defamatory statements targeted consumers in Hawaii, and almost exclusively discuss PRLG's practices in Hawaii.  While PRLG's

never center is in Illinois, and this consideration is due some weight, the other parties to the suit are Hawaii residents and almost all the underlying conduct relevant to the defamation claim occurred in Hawaii, where PRLG allegedly does most of its business.  See Restatement (Second) of Conflict of Laws § 150 (1971) (choice of law for defamation claims based on "aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties").

To sustain a claim for defamation under Hawaii law, a claimant must show: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher [actual malice where the plaintiff is a public figure]; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."  Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., 100 Haw. 149, 171, 58 P.3d 1196, 1218 (2002).

Count IV identifies as defamatory an email dated April 22, 2013, from Lynch to John Edward Rigney.  See Exhibit B to Complaint.  The email states:

> John: I have tendered my resignation to the
> firm.  I went to the bank after some clients
> complained, and found that Teri and Mr. Stone
> had cleaned out the trust account, and have
> done so on a regular basis since October.
> Between May, 2012 when they opened this firm

(and Teri has been running it, no doubt this
time), no retainer funds were deposited until
October, and then it was only $5,000.  It was
left in there for about 50 days, then
transferred out.  From that point on, they
revoked my access and Teri has been
electronically moving all money out.  She
told me there was no money coming in, yet I
have tracked (through clients) almost
$190,000 that should have gone into the trust
account.  As for me, it falls to me, as the
only licensed attorney in the PRLG firm and I
will deal with the consequences.  Mr. Stone
claims he is being admitted this week to the
Hawaii bar.  They hired a new attorney and
did not tell me.  Likely the new attorney
will get Stone admitted pro hac vice.  Guess
now we know why he came here.  Several of the
clients are coming with me, at last count
there were 16 of them. Ms. Petit will take a
fall as well, for her false affidavits and
solicitation of clients here.  Best of luck!
Contact me here if you want and I will call
when I can.

Id.

PRLG does not identify any particular statement in
Lynch's email as false.  The court cannot tell whether PRLG is
saying it did not withdraw funds from the client trust account as
described by Lynch.  Without evidence that the email assertions
are false, PRLG cannot sustain a defamation claim based on the
email.  Not is it clear what position John Edward Rigney has.
If, for example, he works for PRLG, it is hard to understand how
Lynch could be said to have published her allegedly defamatory
email to a third party.  In short, PRLG fails to show how, at
trial, it would meet its burden of establishing each element of
its defamation claim in connection with Lynch's email.

36

PRLG also claims that Defendants defamed the firm by "publishing on the Facebook page of John Kang (alias Lee Miller) [] accusations that [Stone and Petit are] engaging in criminal activity, . . . [are] not licensed to do business in Hawaii, and that [they are] professionally incompetent."  Complaint ¶ 29. PRLG also appears to accuse Defendants of defaming PRLG through the "Ripoff Report" post.  Defendants argue that PRLG "provides no factual basis that any of these statements are false, that they were made with malice or that they were even made by Defendants."  Memorandum in Support of Motion at 24.

As an initial matter, there is no evidence in the record that any Defendant authored the "Ripoff Report" post. Given the lack of evidence in this regard, summary judgment is granted with respect to the portion of the defamation claim against all three Defendants relating to the Ripoff Report.

As to the Facebook post, there is no evidence that Lynch or Rodenhurst played any part in that publication.  Lynch and Rodenhurst are entitled to summary judgment on the portion of the defamation claim relating to the Facebook post.  That leaves the Facebook-related defamation claim against Miller.  No reasonable fact-finder could say, based on the present record, that the statements allegedly posted on Facebook are false. While PRLG says that the post accuses them of criminal activity, the excerpt in the record makes no mention of a criminal

violation.  Instead, it says that PRLG may have violated many "federal and state laws" and restates many of the allegations made against PRLG contained in the homeowners' declarations. Those declarations actually support the gist of the Facebook statements.  See Wilson v. Freitas, 121 Haw. 120, 128, 214 P.3d 1110, 1118 (Haw. Ct. App. 2009) ("The literal truth of every word or detail of the challenged statement is not required; the statement need only be substantially true.").  PRLG provides no evidence in support of its assertion that the posting is false. Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995) (nomovant "may not rest upon mere allegations of denials of pleadings, . . . [their] response must set forth specific facts showing that there is a genuine issue for trial.").

Because PRLG will have the burden of proving at trial every element of its Facebook-related claim against Miller, it is incumbent on PRLG, in opposing the present summary judgment motion, to show how it will meet that burden.  PRLG does not bother to offer evidence refuting each allegedly defamatory utterance.  PRLG instead refers vaguely to evidence that will be produced at trial.  That is insufficient to defeat summary judgment.

Moreover, even if the statements on the Facebook page are false, liability would only attach if the publication were at least negligent.  See, e.g., Obsidian Fin. Grp., LLC v. Cox, 740

F.3d 1284, 1292 (9th Cir. 2014) ("Because [a] blog post addressed a matter of public concern . . . [the defendant could not be] liable for defamation unless [the court] found that [defendant] acted negligently."). Quite apart from what appears to be evidence supporting a good-faith belief that the statements contained in the Facebook post are true, PRLG fails to show that the publication was at least negligent.

Summary judgment is therefore granted in Miller's favor on PRLG's Facebook-related defamation claim.

### E.    Tortious Interference (Count V).

PRLG's fifth claim is labeled in the Complaint simply as "tortious interference." In its order granting in part and denying in part Defendants' motion to dismiss, this court called Count V a "tortious interference with prospective business advantage claim." Under Hawaii law, to prevail on such a claim PRLG must show:

> (1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

Robert's Hawaii School Bus, Inc. v. Laupahoehoe Trans. Co., 91

Haw. 224, 257, 982 P.2d 853,888 (1999).

The Complaint refers to existing clients that allegedly "cancelled their contracts" with PRLG based on statements by Defendants. Although PRLG refers to defamatory statements in this connection, PRLG may not be intending to limit itself to the statements that form the basis of the defamation claim. PRLG may, for example, be complaining that, in inducing clients to retain her instead of PRLG, Lynch, aided by her co-Defendants, induced clients to stop paying the monthly $1000 fee to PRLG. Under such a theory, PRLG might colorably argue that clients might have stayed with PRLG but for Defendants' solicitation.

Because this court has ruled earlier in this order that there are questions of fact as to whether Lynch breached her contract with PRLG, and because those possible breaches may be tied to the alleged tortious interference claim against all three Defendants, this court denies summary judgment as to Count V.

VI.     CONCLUSION.

Defendants' motion for summary judgment is granted in part and denied in part. Count I, the breach of contract claim, is before this court only against Lynch, as the court previously dismissed Count I as against Rodenhurst and Miller. Summary judgment is granted in Lynch's favor as to Count I except with respect to the portions of Count I based on Lynch's alleged failure to return client files, alleged solicitation of PRLG's

40

clients, and alleged failure to produce a final results report.
The portions of Count I relating to those three alleged
circumstances remain for further adjudication.

Summary judgment is denied with respect to Count II,
the Illinois Trade Secrets Act claim, and Count V, the tortious
interference claim.

Summary judgment is granted in favor of Defendants on
Count III, the CFAA claim, and on Count IV, the defamation claim.

Therefore, portions of Count I, as well as Counts II
and V, remain in issue.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 30, 2014.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Property Rights Law Group, P.C. v. Sandra Lynch, et al., Civ No. 13-00273 SOM/RLP,
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

41